United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILEY GILL, et al.,

           Plaintiffs,

    v.

DEPARTMENT OF JUSTICE, et al.,

           Defendants.

Case No.  14-cv-03120-RS

**ORDER DENYING MOTION TO DISMISS**

## I.  INTRODUCTION

In this action brought under the Administrative Procedures Act ("APA"), plaintiffs challenge certain aspects of the National Suspicious Activity Reporting Initiative ("NSI"), a nationwide program that collects, vets, and disseminates intelligence with a possible nexus to terrorism.  Plaintiffs contend that defendants Department of Justice ("DOJ") and the Program Manager-Information Sharing Environment ("PM-ISE") have issued protocols utilizing an overly broad standard to define the types of activities that should be deemed as having a potential nexus to terrorism.   As a result, plaintiffs allege, state and local law enforcement authorities submit "Suspicious Activity Reports" ("SARs") to the federal government even if unsupported by reasonable suspicion of criminal activity, and innocent Americans are "wrongly branded as potential terrorists."

Plaintiffs contend that the protocols they are challenging conflict with a duly promulgated DOJ regulation, 28 C.F.R. Part 23, which they assert was adopted to protect

constitutional and privacy rights by prohibiting the collection of criminal intelligence unless supported by reasonable suspicion.   In their four-count complaint, plaintiffs assert that each of the two challenged protocols, (1) violates the APA's requirement that the public be provided a notice and comment period prior to adoption of "legislative rules," and/or, (2) is invalid as "arbitrary and capricious," in light of the alleged conflict with 28 C.F.R. Part 23.

Defendants move to dismiss, contending plaintiffs lack standing, and have not stated viable APA claims in any event.  Alternatively, defendants challenge venue.  The motion will be denied, for reasons explained below.


## II.  BACKGROUND

As plaintiffs describe it, the NSI was created to facilitate the nationwide sharing of information potentially related to terrorism. It is premised on the notion that while state, local, and tribal law enforcement agents – so called "front line" personnel – are well situated to gather that type of information, their reports should be vetted under uniform standards.  DOJ and PM-ISE have each issued protocols relating to SAR reporting designed to provide such standards for evaluating information collected by front line personnel before it is disseminated nationally.

DOJ's protocols, which plaintiffs refer to as the "DOJ SAR Standard," appear in several documents, including one entitled "eGuardian 2008 Privacy Impact Assessment."   The PM-ISE protocols appear in a document entitled "Information Sharing Environment (ISE) – Functional Standard (FS) – Suspicious Activity Reporting (SAR) Version 1.5." (hereinafter "Functional Standard 1.5").  Defendants contend there is only one standard— Functional Standard 1.5—and that the DOJ protocols conform thereto and do not represent a set of rules that could be separately challenged.   Plaintiffs object that defendants' position contradicts the allegations of the complaint and certain evidence.  For purposes of the present motion, however, neither party contends there is any significance to the dispute over whether there is one set of protocols or two.  For convenience, the challenged protocols will hereinafter be referred to as "Defendants' Standards" without any determination as to whether the so-called DOJ SAR

United States District Court
Northern District of California

1   Standard is separate from Functional Standard 1.5 or not.

2          According to the allegations of the complaint, the SAR process proceeds in three stages:

3   collection by front line personnel, vetting by trained analysts at "fusion centers," and

4   dissemination to law enforcement nationwide.  Front line personnel are allegedly trained in

5   Defendants' Standards, collect information about people engaged in activities that purportedly

6   have a potential nexus to terrorism, and submit the information in the form of SARs, either

7   directly to the Federal Bureau of Investigation or to a fusion center.

8          Fusion centers, which are federally funded, gather, receive, store, analyze, and share

9   intelligence, including SARs, related to terrorism and other threats.  Although the local collecting

10  agencies perform some vetting, the primary responsibility for doing so rests with fusion centers,

11  whose staff are trained in Defendants' Standards and review SARs for compliance with those

12  Standards.

13         SARs that meet Defendants' Standards are then disseminated both regionally through the

14  fusion center's database, and nationally through a data base known as "eGuardian" and/or another

15  national database.[1]  The FBI oversees eGuardian, which allows law enforcement personnel across

16  the country to access the SARs that have been uploaded to it.  Plaintiffs expressly allege that the

17  federal government maintains SARs sent to eGuardian for 30 years, even when the FBI has

18  determined that a particular SAR has no nexus to terrorism.[2]

19         Each of the four plaintiffs knows or believes that he is the subject of an SAR, or in the case

20  of one plaintiff, a report similar to an SAR.   Plaintiff Wiley Gill, a U.S. citizen and graduate of

21

22  ――――――――――――――
    [1]  Defendants contend that eGuardian is presently the *only* such database system in use, and
23  request judicial notice of materials found on certain government websites to establish that fact.
    While judicial notice would not be an appropriate mechanism to resolve this factual issue at the
24  pleading stage or otherwise, the dispute is not material to the issues presented, as the result would
    be the same regardless of the number of databases presently in use.
25
    [2]  From materials attached as exhibits to the complaint, however, it appears that where no nexus to
26  potential terrorism can be validated, the SAR will not be made accessible through the ISE.  Also,
    the protocols appear to include some measures to address removing unfounded information.  See
27  Complaint Exh. D, pp. 61. 63; Exh. E, p. 93.

28

United States District Court
Northern District of California

1  California State University, Chico, converted to Islam after learning about the religion in a class.

2  In 2012, the Chico Police Department conducted a warrantless search of his home for reasons

3  allegedly later acknowledged to be unfounded.  The police reported the encounter and two earlier

4  interactions with Gill in an SAR. The SAR notes that Gill "is unemployed" and states that he had

5  "potential access to flight simulators via the internet," because his computer displayed a webpage

6  titled something "similar to 'Games that fly under the radar.'" The complaint asserts that Gill, a

7  video game enthusiast, was likely viewing a website about video games.  The SAR concludes by

8  describing as "worthy of note" Gill's "full conversion to Islam as a young WMA [white, male

9  adult]" and his "pious demeanor."

10      Plaintiff Khaled Ibrahim, a U.S. citizen of Egyptian descent who works in accounting, is

11  the subject of an SAR describing his attempt to purchase "a large amount of computers."  At the

12  time, Ibrahim, worked as a purchasing agent, and was seeking to make a bulk purchase of

13  computers for his employer.

14      Plaintiff Aaron Conklin, believes he is the subject of an SAR.  Conklin is a graphic design

15  student and amateur photographer with an interest in industrial architecture. He has twice been

16  prevented from photographing oil refineries.  In one incident at the Shell refinery in Martinez,

17  California, he was questioned by private security, and then detained and searched by Contra Costa

18  Sheriff's deputies, who told him he had to be placed on an "NSA watch list."

19      Finally, James Prigoff is a U.S. citizen and renowned photographer of public art, who

20  believes he is the subject of an "SAR or SAR-like report."  While attempting to photograph a

21  famous piece of public art on a natural gas storage tank near Boston, he allegedly was harassed by

22  private guards, who prevented him from photographing the tank from his preferred location.

23  Although he provided the guards no identifying information, the FBI purportedly then tracked him

24  cross-country, visited his home in Sacramento, and questioned a neighbor about him.[3]

25  _____

26  [3] Because the incident involving Prigoff predated adoption of Defendants' Standards, they contend
those standards cannot have caused his alleged injury, and, in a footnote, contend his claims are
27  time-barred in any event.  Even assuming the timing issues could ultimately undermine Prigoff's
claims, defendants have not shown that his separate dismissal from the action is warranted at this

28

ORDER DENYING MOTION TO DISMISS
CASE NO. 14-cv-03120-RS

4

III. LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While "detailed factual allegations are not required," a complaint must have sufficient factual allegations to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 566 U.S. 652, 678 (2009) (citing *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. This standard asks for "more than a sheer possibility that a defendant acted unlawfully." *Id*. The determination is a context-specific task requiring the court "to draw in its judicial experience and common sense." *Id*. at 1950.

A motion to dismiss a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the claims alleged in the complaint. *See Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal under Rule 12(b)(6) may be based on either the "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

Defendants also invoke Rule 12(b)(1), arguing that plaintiffs' purported lack of standing deprives the Court of subject matter jurisdiction. A motion to dismiss for lack of subject matter jurisdiction may be made on the grounds that the lack of jurisdiction appears from the "face of the complaint," or may be based on extrinsic evidence apart from the pleadings. *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003); *McMorgan & Co. v. First Cal. Mortgage Co.*, 916 F. Supp. 966, 973 (N.D. Cal. 1995). Where the jurisdictional issue is whether the plaintiff has standing, dismissal is also appropriate under Rule 12(b)(6) absent sufficient factual allegations in the complaint, which, if proven, would confer standing. *Sacks v. Office of Foreign Assets Control*, 466 F.3d 764, 771 (9th Cir. 2006).

juncture.

1    Defendants' venue challenge is brought under Rule 12(b)(3), which states that a party may

2    move to dismiss a case for "improper venue."  The question of whether venue is "wrong" or

3    "improper" is generally governed by 28 U.S.C. § 1391. That provision states that "[e]xcept as

4    otherwise provided by law . . . this section shall govern the venue of all civil actions brought in

5    district courts of the United States." § 1391(a)(1).  It further provides that "[a] civil action may be

6    brought in—(1) a judicial district in which any defendant resides, if all defendants are residents of

7    the State in which the district is located; (2) a judicial district in which a substantial part of the

8    events or omissions giving rise to the claim occurred, or a substantial part of property that is the

9    subject of the action is situated; or (3) if there is no district in which an action may otherwise be

10   brought as provided in this section, any judicial district in which any defendant is subject to the

11   court's personal jurisdiction with respect to such action." § 1391(b). When venue is challenged,

12   the court must determine whether the case falls within one of the three categories set out in §

13   1391(b). If it does, venue is proper; if it does not, venue is improper, and the case must be

14   dismissed or transferred under § 1406(a).

15

16

17                                   III. DISCUSSION

18       A. <u>Standing</u>

19       "To satisfy Article III's standing requirements, a plaintiff must show (1) she has suffered

20   an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural

21   or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3)

22   it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable

23   decision." *Bernhardt v. Cnty. of Los Angeles*, 279 F.3d 862, 868–69 (9th Cir. 2002) (quoting

24   *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)).

25       Defendants primarily frame their challenge to plaintiffs' standing as a purported failure to

26   allege facts showing causation and redressability.  Defendants' argument characterizes plaintiffs'

27   supposed injuries as arising, if at all, primarily from the actions of the "front line" state and local

United States District Court
Northern District of California

United States District Court
Northern District of California

1    law enforcement authorities.   Defendants contend plaintiffs have not alleged, and credibly cannot,

2    that the scrutiny they purportedly received from state and local police, or even from private

3    security personnel, was the result of the challenged protocols or other conduct of defendants.

4        The allegations of the complaint, however, show that the gravamen of the alleged injuries

5    lie not in actions of "front line" authorities standing alone, but in the fact that those authorities,

6    pursuant to the guidance and training provided by defendants, submit SAR reports under criteria

7    and circumstances that are allegedly inconsistent with legal principles and policies embodied in

8    other law.  Plaintiffs' cognizable challenge is not to the conduct of law enforcement or private

9    security officers during the alleged encounters *per se*, although there is at least some implication

10   that plaintiffs believe Defendants' Standards lead front line personnel to overreach even at the

11   point of making initial observations.  Plaintiffs are claiming injury from what occurs *after* the

12   encounters, pursuant to the Standards.

13       As such, defendants' contentions as to causality and redressability both fail.  The harms

14   plaintiffs seek to remedy arise directly from the existence of Defendants' Standards.  If plaintiffs

15   can show those standards violate the APA, they will be declared invalid.

16       While invoking causality and redressability as the main purported shortcomings of

17   plaintiffs' standing, defendants also imply that merely being the subject of an SAR, in the national

18   database, should not be deemed a cognizable injury.  In light of the privacy and reputational

19   interests involved, however, this argument is not tenable.  *See Meese v. Keene*, 481 U.S. 465, 474-

20   75 (1987) (plaintiff had standing to challenge statute labeling films he exhibited as "political

21   propaganda" because of "risk of injury to his reputation"); *Joint Anti-Fascist Refugee Comm. v.*

22   *McGrath*, 341 U.S. 123, 131, 140-41 (1951) (organizations had "clear" standing to challenge

23   loyalty oath based on injury, inter alia, to "reputation"). [4] Accordingly, the motion to dismiss for

24   lack of standing must be denied.

25   _____

26   [4]  Defendants suggest that because SARs are not disseminated to the general public, plaintiffs
     suffer no reputational injury.  In light of the alleged wide distribution and availability of the
27   information, however, this argument is not persuasive.

28

1

2          B.  Alternative remedies

3          Defendants further argue that Plaintiffs' APA claims are barred because Plaintiffs have

4   adequate alternative remedies, in that they theoretically could sue the individual local agencies or

5   private guards that collected SARs about them.  This argument similarly misconstrues the nature

6   of plaintiffs' claims.  The challenge is to the system itself, not to the acts of the "front line"

7   personnel.  While plaintiffs may indeed believe that those officials and private actors overstepped

8   their bounds in at least some of the instances (*e.g*., Conklin contends the security guards had no

9   right to interfere with his taking photographs on public property), the primary issue is the

10  collection and dissemination of SARs through national databases under standards that plaintiffs

11  contend are not appropriate.  A suit against local agencies or security guards cannot change

12  Defendants' Standards.  Indeed, local and private defendants likely would have a defense against

13  any claim that their preparation and transmission of SARs is wrongful, when undertaken pursuant

14  to those standards.  Accordingly, the APA claims are not subject to dismissal on grounds that

15  plaintiffs have adequate remedies elsewhere.

16

17          C.  Finality of agency action

18          Claims under the APA lie only against "final" agency actions.  In *Bennett v. Spear*, 520

19  U.S. 154 (1997), the Supreme Court set out the legal standard for agency action to be considered

20  final:

21              First, the action must mark the "consummation" of the agency's
                decisionmaking process—it must not be of a merely tentative or
22              interlocutory nature. And second, the action must be one by which
                "rights or obligations have been determined," or from which "legal
23              consequences will flow."

24  *Id*. at 177-78 (citations omitted).  Defendants concede the first prong, but challenge the second,

25  asserting that Functional Standard 1.5 does not impose a "binding legal norm," but merely

26  provides "functional guidance for the operation of the NSI" and that NSI participants are not

27  "require[d]" to follow this guidance.

28

United States District Court
Northern District of California

1    It may be that Defendants' Standards do not mandate any state or local law

2    enforcement agency participate in the NSI and share SARs meeting those standards. There is no

3    dispute, however, that if a state or local law enforcement agency does participate in the NSI and

4    submits SARs, it is to do so consistent with the Defendants' Standards.  As such, those standards

5    "alter the legal regime" and have "direct and appreciable legal consequences," such that the

6    second prong of the finality requirement is satisfied.  *Bennett*, 520 U.S. at 178.

7

8         D.  Arbitrary and Capricious

9    Plaintiffs' first and second claims for relief seek to set aside the DOJ SAR Standard and

10   Functional Standard 1.5, respectively, as "arbitrary, capricious, an abuse of discretion, otherwise

11   not in accordance with law."  Plaintiffs' theory is that because Defendants' Standards do not

12   require SARs to be based on a "reasonable suspicion" standard, they conflict with 28 C.F.R. Part

13   23's requirement that criminal intelligence not be collected or maintained unless supported by

14   "reasonable suspicion."

15   The rules in that section proceed from an "[o]perating principle[]" that a "project shall

16   collect and maintain criminal intelligence information concerning an individual only if there is

17   reasonable suspicion that the individual is involved in criminal conduct or activity and the

18   information is relevant to that criminal conduct or activity."  28 C.F.R. § 23.20(a).  There is no

19   dispute that Defendants' Standards allow for collection and dissemination of SARs not meeting

20   that test.

21   Defendants insist there is no conflict between the Standards and Part 23 because, they

22   contend, the NSI is not a system for collecting "criminal intelligence."  They argue that the

23   Functional Standard and 28 C.F.R. Part 23 were issued pursuant to distinct statutory authorities for

24   application to different information gathering programs. Compare 42 U.S.C. § 3789g(c)

25   (authorizing OJP to issue policy standards for criminal intelligence systems funded under the

26   Omnibus Act) with 6 U.S.C. § 485(f)(2)(A)(iii) (authorizing the Program Manager to issue

27   functional standards for the ISE).  They note that the operating principles of 28 C.F.R. Part 23 are

28

1   expressly linked to federal funding of criminal intelligence systems under the Omnibus Act. *See*

2   42 U.S.C. § 3789g(c); 28 C.F.R. § 23.1; 28 C.F.R. § 23.3; 28 C.F.R. § 23.30; 28 C.F.R. § 23.40.

3        As plaintiffs point out, however, whether or not ISE is appropriately characterized as a

4   criminal intelligence system within the scope of Part 23 may depend on factual issues not

5   appropriately resolved at the motion to dismiss stage. It may be that the question of whether

6   Defendants' Standards are subject to being set aside as "arbitrary, capricious, an abuse of

7   discretion, otherwise not in accordance with law" will ultimately turn primarily on legal issues.

8   The question is certainly the heart of this case. At this juncture, however, defendants have not

9   shown the declaratory relief claims should be dismissed, as opposed to adjudicated on the merits.

10

11        E.   Notice and comment

12        Plaintiffs' third and fourth claims for relief seek determinations that the DOJ SAR

13   Standard and Functional Standard 1.5, respectively, are invalid because they were adopted without

14   notice and comment.  An agency can issue a legislative rule only by using the notice and comment

15   procedure described in the APA, unless it publishes a specific finding of good cause documenting

16   why such procedures "are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C.

17   § 553(b), (b)(B).  In contrast, an agency need not follow the notice and comment procedure to

18   issue an interpretive rule. § 553(b)(A).  *See Hemp Indus. Ass'n v. Drug Enforcement Admin*., 333

19   F.3d 1082, 1087 (9th Cir. 2003).  There is no dispute that the Standards were adopted without

20   notice and comment, or a specific finding of good cause that none was appropriate.

21

22            Courts have struggled with identifying the difference between
       legislative rules and interpretive rules. In general terms, interpretive

23            rules merely explain, but do not add to, the substantive law that
       already exists in the form of a statute or legislative rule. *Yesler*

24            *Terrace Community Council v. Cisneros*, 37 F.3d 442, 449 (9th
       Cir.1994). Legislative rules, on the other hand, create rights, impose

25            obligations, or effect a change in existing law pursuant to authority
       delegated by Congress. *Id.*

26

27   *Hemp Indus.*, 333 F.3d at 1087.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1         Plaintiffs contend Defendants' Standards are "legislative" because no statute sets forth "a

2   self-executing substantive standard governing the type of information that can be collected,

3   maintained, or disseminated."  Plaintiffs contend the statutes instead delegate the authority to

4   promulgate such standards to defendants, and that they have done so in Functional Standard 1.5.

5   Defendants, in turn, point to the voluntary nature of the system as a whole to argue the standards

6   are not legislative in nature.

7         This issue also goes to the heart of plaintiffs' case for declaratory relief.  The proper

8   characterization of Defendants' Standards as legislative or interpretative likely will involve few

9   disputed factual issues, and perhaps can be resolved on cross-motions for summary judgment.  At

10  this juncture, however, plaintiffs have sufficiently identified potential grounds for treating the

11  standards as legislative to avoid dismissal.  Whether those arguments will prevail on a more

12  fulsome record remains to be seen.

13

14      F. <u>Venue</u>

15        Finally, defendants contend that at a minimum, the claims of all plaintiffs other than

16  Ibrahim should be severed and dismissed because they arose outside this district.[5]  This argument

17  relies on the same mischaracterization of the claims discussed above.  Plaintiffs are not

18  challenging the circumstances of their individual encounters with authorities *per se*, but the

19  underlying federal scheme.

20        Parties may be permissively joined where their claims arise "out of the same transaction,

21  occurrence, or series of transactions or occurrences," and there is a common "question of law or

22  fact." Fed. R. Civ. P. 20(a)(1).  This rule "is to be construed liberally in order to promote trial

23  convenience and to expedite the final determination of disputes, thereby preventing multiple

24  lawsuits." *League to Save Lake Tahoe v. Tahoe Reg'l Planning Agency*, 558 F.2d 914, 917 (9th

25  _____

26  [5]   It is unclear why defendants believe Conklin's claims arose outside this district given that in
    one of the alleged events underlying those claims he was photographing a refinery in Contra Costa
27  County.

28

Cir. 1977).  Challenges to a governmental policy or system generally satisfy the same transaction or occurrence requirement. *See United States v. Mississippi*, 380 U.S. 128, 142-43 (1965); see also *Turner v. LaFond*, No. C 09–00683 MHP, 2009 WL 3400987, at *3 (N.D. Cal Oct. 20, 2009) ("Typically this requirement will be met where plaintiffs collectively challenge a widely-held practice or policy.")  Accordingly, the venue objection is not tenable.

## V.  CONCLUSION

The motion to dismiss is denied.  The parties shall appear for a further case management conference on March 12, 2015, with an updated joint case management conference statement to be filed one week in advance.

**IT IS SO ORDERED**.

Dated: February 20, 2015

_____
RICHARD SEEBORG
United States District Judge