UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILEY GILL, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>DEPARTMENT OF JUSTICE, et al.,<br><br>    Defendants. | Case No. 14-cv-03120-RS<br><br>**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT** |

## I. INTRODUCTION

This is a challenge brought under the Administrative Procedures Act ("APA"), to certain aspects of the National Suspicious Activity Reporting Initiative ("NSI"), a nationwide program that collects, vets, and disseminates intelligence with a possible nexus to terrorism. Plaintiffs contend defendant Program Manager-Information Sharing Environment ("PM-ISE") has adopted a so-called "Functional Standard" that utilizes overly broad criteria to define the types of activities deemed as having a potential nexus to terrorism. As a result, plaintiffs allege, state and local law enforcement authorities submit "Suspicious Activity Reports" ("SARs") to the federal government even if unsupported by reasonable suspicion of criminal activity, and innocent Americans are "wrongly branded as potential terrorists."

Plaintiffs contend the Functional Standard conflicts with a duly-promulgated DOJ regulation, 28 C.F.R. Part 23 (hereafter "Part 23"), which they assert was adopted to protect

constitutional and privacy rights by prohibiting the collection of "criminal intelligence" unless supported by "reasonable suspicion."  The Functional Standard, in contrast, calls for sharing of SARs whenever they reflect "observed behavior" that is "reasonably indicative of pre-operational planning associated with terrorism or other criminal activity."  The crux of the controversy, therefore, lies in the distinction between the "reasonably indicative" standard, and the "reasonable suspicion" standard.   Both sides agree that "reasonably indicative" is a lesser standard which calls for dissemination of SARs even in the absence of "reasonable suspicion."  The question is whether defendants failed to comply with the APA in adopting the "reasonably indicative" standard.

Plaintiffs contend defendants violated the APA in two ways. First, plaintiffs insist the Functional Standard was adopted without complying with the APA's requirement that the public be provided a notice and comment period prior to adoption of "legislative rules."  While defendants acknowledge no such notice and comment procedure was utilized, they argue that the Functional Standard is not a "legislative rule" subject to the requirement, or that even if it were, the violation was harmless because the Functional Standard was adopted through a collaborative process that included public input. Second, plaintiffs contend adoption of the Functional Standard was "arbitrary and capricious" because of the alleged conflict with Part 23.  Defendants argue there is no conflict that renders adoption of the Functional Standard improper.

The parties have brought cross-motions for summary judgment.  Because defendants have shown that adoption of the Functional Standard did not violate the APA, their motion will be granted and plaintiffs' motion will be denied.

## II.  BACKGROUND

As plaintiffs describe it, the NSI was created to facilitate the nationwide sharing of information potentially related to terrorism. It is premised on the notion that while state, local, and tribal law enforcement agents – so called "front line" personnel – are well situated to gather that type of information, their reports should be vetted under uniform standards.  DOJ and PM-ISE have issued protocols relating to SAR reporting designed to provide such standards for evaluating

information collected by front line personnel before it is disseminated nationally. At the time of a prior motion to dismiss in this action, the parties were disputing whether DOJ's protocols and the PM-ISE protocols were separate or not. Now, the parties appear to be in agreement that only the one "Functional Standard" is at issue—and that it was first adopted in 2009, and revised in 2015.

The SAR process proceeds in three stages: collection of information by front line personnel, vetting by trained analysts at "fusion centers," and dissemination to law enforcement nationwide. Front line personnel are allegedly trained in the Functional Standard, collect information about people engaged in activities that purportedly have a potential nexus to terrorism, and submit such information in the form of SARs, either directly to the Federal Bureau of Investigation or to a fusion center.

Fusion centers, which are federally funded, gather, receive, store, analyze, and share intelligence, including SARs, related to terrorism and other threats. Although the local collecting agencies perform some vetting, the primary responsibility for doing so rests with fusion centers, whose staff are trained in the Functional Standard and review SARs for compliance with that standard. SARs meeting the standard are then disseminated both regionally through the fusion center's database, and nationally through a data base known as "eGuardian."[1] The FBI oversees eGuardian, which allows law enforcement personnel across the country to access SARs that have been uploaded to it. Plaintiffs allege that the federal government maintains SARs sent to eGuardian for 30 years, even when the FBI has determined that a particular SAR has no nexus to terrorism.[2]

---

[1] There is some indication certain other databases may have been used in the past.

[2] From materials attached as exhibits to the complaint, however, it appears that where no nexus to potential terrorism can be validated, the SAR will not be made accessible through the ISE. Also, the protocols appear to include some measures to address removing unfounded information. See Complaint Exh. D, pp. 61-63; Exh. E, p. 93.

# III. LEGAL STANDARD

Although the parties characterize their briefing as constituting cross-motions for "summary judgment," they recognize this is not an inquiry under Rule 56 of the Federal Rules of Civil Procedure as to whether there are disputed factual issues for trial. Rather, this is the review on the merits under the APA of the validity of the adoption of the Functional Standard. *See*, *Klamath Siskiyou Wildlands Ctr.,* 962 F. Supp. 2d at 1233; *see also Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89 (D.D.C. 2006) ("[T]he standard set forth in Rule 56(c) does not apply [in an APA case] because of the limited role of a court in reviewing the administrative record."); *McCrary v. Gutierrez*, 495 F. Supp. 2d 1038, 1041 (N.D. Cal. 2007) (judicial review of agency action under the APA limited to the administrative record).

"Under the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas 'the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" *Sierra Club*, 459 F.Supp. 2d at 90 (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769–70 (9th Cir. 1985)). In other words, "the district court acts like an appellate court, and the 'entire case' is 'a question of law.'" *Nat'l Law Ctr. on Homelessness & Poverty v. U.S. Dep't of Veterans Affairs*, 842 F. Supp. 2d 127, 130 (D.D.C. 2012) (quoting *Amer. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)). "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Stuttering Found. of Am. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007).

# IV. DISCUSSION

## A. Notice and Comment

An agency may lawfully issue a so-called "legislative rule" only by using the notice and comment procedure described in the APA, unless it publishes a specific finding of good cause documenting why such procedures "are impracticable, unnecessary, or contrary to the public

interest." 5 U.S.C. § 553(b), (b)(B).  In contrast, an agency need not follow the notice and comment procedure to issue an "interpretive rule." § 553(b)(A).  *See Hemp Indus. Ass'n v. Drug Enforcement Admin.*, 333 F.3d 1082, 1087 (9th Cir. 2003).  Here, there is no dispute that the Functional Standard was adopted without notice and comment, or a specific finding of good cause that none was appropriate.

> Courts have struggled with identifying the difference between legislative rules and interpretive rules. In general terms, interpretive rules merely explain, but do not add to, the substantive law that already exists in the form of a statute or legislative rule. *Yesler Terrace Community Council v. Cisneros*, 37 F.3d 442, 449 (9th Cir.1994).  Legislative rules, on the other hand, create rights, impose obligations, or effect a change in existing law pursuant to authority delegated by Congress. *Id.*

*Hemp Indus.*, 333 F.3d at 1087.

Plaintiffs argue the Functional Standard is "legislative" because, they contend, no statute sets forth a self-executing substantive standard governing the type of information that can be collected, maintained, or disseminated.  Plaintiffs explain the statutes operate instead to delegate the authority for the promulgation of such standards to defendants, and that they have done so in the Functional Standard.  Defendants, in turn, point to the voluntary nature of the system as a whole to argue the standard is not legislative in nature.

The Functional Standard does not fit neatly into *either* side of the dichotomy described in *Hemp Industries*, above.  It is not inarguably merely an "explanation" of other substantive law that already existed "in the form of a statute or legislative rule."  Nor, however, is it plainly a rule that "create[s] rights, impose[s] obligations, or effect[s] a change in existing law pursuant to authority delegated by Congress."

Rather, as defendants argue, it primarily describes an operating procedure—a policy, a plan, a strategy—allowing cooperation and communication among various governmental actors.  At the motion to dismiss stage, defendants argued this "guidance" aspect of the standard meant it was not a "final agency action" subject to judicial review.  *See Bennett v. Spear*, 520 U.S. 154

1  (1997) ("First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'")  While there was and is no dispute that the Functional Standard was neither tentative nor interlocutory, it far less clearly constitutes a rule determining legal rights and obligations. Even though the order on the motion to dismiss called that question in plaintiff's favor at the pleading stage, there is good reason to treat the Functional Standard as not constituting a final agency action within the meaning of *Bennet v. Spear.*

Even assuming, however, there was "final agency action," it was fundamentally a policy guidance statement not subject to a notice-and-comment requirement.

> When a federal agency issues a directive concerning the future exercise of its discretionary power, for purposes of APA section 553, its directive will constitute either a substantive rule, for which notice-and-comment procedures are required, or a general statement of policy, for which they are not . . . .
>
> To the extent that the directive merely provides guidance to agency officials in exercising their discretionary powers while preserving their flexibility and their opportunity to make "individualized determination [s]," it constitutes a general statement of policy. . . .

*Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1013–14 (9th Cir. 1987).

Accordingly, defendants are entitled to summary judgment that adoption of the Functional Standard without a notice-and-comment period did not violate the APA.[3]

---

[3] As noted above, defendants also argue any failure to follow the notice and comment procedures of the APA was harmless in light of how the Functional Standard was adopted. Defendants insist it was a collaborative process that included public input. It is subject to question, however, whether an agency could avoid any statutory notice and comment process by undertaking a more informal procedure.

### B. Arbitrary and capricious

Plaintiffs also seek to set aside the Functional Standard as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

> The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made . . . . . . In reviewing that explanation, [the court] must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment . . . .

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983) (citations omitted).

As the *Motor Vehicles* court further explained:

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.*

Here, plaintiffs' theory is that because the Functional Standard does not require SARs to be based on a "reasonable suspicion," it conflicts with Part 23's requirement that criminal intelligence not be collected or maintained unless supported by "reasonable suspicion." The rules in Section 23 proceed from an "[o]perating principle[]" that a "project shall collect and maintain criminal intelligence information concerning an individual only if there is reasonable suspicion that the individual is involved in criminal conduct or activity and the information is relevant to that criminal conduct or activity." 28 C.F.R. § 23.20(a). There is no dispute that the Functional Standard allows for collection and dissemination of SARs not meeting that test.

Defendants insist there is no conflict between the Functional Standard and Part 23 because,

they contend, the NSI is not a system for collecting "criminal intelligence." They argue that the Functional Standard and 28 C.F.R. Part 23 were issued pursuant to distinct statutory authorities for application to different information gathering programs. Compare 42 U.S.C. § 3789g(c) (authorizing OJP to issue policy standards for criminal intelligence systems funded under the Omnibus Crime Control and Safe Streets Act of 1968 Pub. L. 90-351, 82 Stat. 197, codified at 42 U.S.C. §3711 *et seq.* ("Omnibus Act") with 6 U.S.C. § 485(f)(2)(A)(iii) (authorizing the Program Manager to issue functional standards for the ISE). Defendants note that the operating principles of Part 23 are expressly linked to federal funding of criminal intelligence systems under the Omnibus Act. *See* 42 U.S.C. § 3789g(c); 28 C.F.R. § 23.1; 28 C.F.R. § 23.3; 28 C.F.R. § 23.30; 28 C.F.R. § 23.40.

Plaintiffs correctly observe that the arguments defendants now make about the claimed lack of Omnibus Act funding were not the basis on which the agency decided to adopt the "reasonably indicative" standard in lieu of a "reasonable suspicion" standard. Plaintiffs also rightly note that, generally, "an agency's action must be upheld, if at all, on the basis articulated by the agency itself," *Motor Vehicle,* 463 U.S. at 50.

Nevertheless, plaintiffs have not shown that it was arbitrary and capricious for the Functional Standard to depart from the "reasonable suspicion" standard of Part 23. The administrative record includes the following description of why the "reasonably indicative" standard was adopted:

> The use of the "reasonably indicative" determination process allows supervisors at source agencies and trained analysts and investigators at fusion centers and other agencies to have a uniform process that will result in better quality SARs and the posting of more reliable ISE-SARs to the ISE Shared Spaces, while at the same time enhancing privacy, civil rights, and civil liberties protections. Furthermore, this revision improves mission effectiveness and enables NSI participating agency personnel to identify and address, in a more efficient manner, potential criminal and terrorism threats by using more narrowly targeted language. Finally, better quality SARS should result in a sufficiently high quality of information enabling agencies and analysts to "connect the dots" while not producing so much information as to overwhelm agency analytical capacity. In addition, the "reasonably indicative" determination is an essential privacy, civil rights, and civil liberties protection because it

> emphasizes a behavior-focused approach to identifying suspicious activity and mitigates the risk of profiling based upon race, ethnicity, national origin, or religious affiliation or activity.

Plaintiffs insist the record also shows defendants were "aware of the need" to address Part 23, because it was raised during discussion of the Functional Standard. Plaintiffs' argument, however, presupposes that SARs are "criminal intelligence" governed under Part 23. Defendants have shown that to the contrary, the Functional Standard was developed to address data collection and dissemination issues not already within the scope of Part 23. While they certainly could have adopted the same standard, the record reveals no "clear error of judgment" or "failure to consider an important aspect of the problem" or such a counter-factual or implausible explanation as to permit the court to substitute its judgment of what a better rule might be.[4] Accordingly, defendants are entitled to summary judgment that adoption of the Functional Standard did not violate the APA as arbitrary and capricious.

C. Motion to strike

In connection with their argument that Part 23 applies only to systems funded under the Omnibus Act, defendants have offered a declaration of Marilynn B. Atsatt to show that the FBI eGuardian and the "NSI SAR Data Repository" are not funded under the Omnibus Act. Defendants also proffer a declaration from Basil N. Harris describing the adoption and amendment of the Functional Standard, including the public input that allegedly was solicited and considered.

Defendants have consistently sought to enforce the principle that, with narrow exceptions, APA actions are decided on the administrative record and nothing more. In extended proceedings before the assigned magistrate judge, and in objections to her rulings, defendants resisted attempts to expand that record. Defendants also successfully resisted plaintiffs' requests to be allowed discovery. In light of that discovery history, plaintiffs' motion to strike these declarations is

---

[4] Plaintiffs have offered policy arguments as to why, in their view, the "reasonably indicative" standard draws a poor balance between individual rights and public safety. In an action under the APA, however, something more must be shown.

granted.[5]

## V.  CONCLUSION

Defendants' motion is granted, and plaintiffs' motion is denied. A separate judgment will issue.

**IT IS SO ORDERED**.

Dated: March 27, 2017

RICHARD SEEBORG
United States District Judge

---

[5] Plaintiffs' motion to supplement the record under the exception for extra-record evidence related to standing is denied as moot.  Defendants' challenge to plaintiffs' standing was rejected at the motion to dismiss stage, and was not renewed on summary judgment.